1  Leonard M. Shulman – Bar No. 126349
   Mark Bradshaw – Bar No. 192540
2  Melissa R. Davis – Bar No. 245521
   **SHULMAN HODGES & BASTIAN LLP**
3  8105 Irvine Centre Drive, Suite 600
   Irvine, California 92618
4  Telephone:     (949) 340-3400
   Facsimile:     (949) 340-3000
5  Email:     lshulman@shbllp.com
              mdavis@shbllp.com
6
   Proposed Insolvency Counsel for
7  Debtor and Debtor in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION**

10

11 | In re | Case No. 6:11-bk-19484-WJ |

12 | **COPELAND PROPERTIES TWELVE,** | Chapter  11 |

13 | **LP, a California limited partnership,** | **DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT** |

14  Debtor and Debtor-in-Possession.

15

16 **[Application for Order Shortening Time for hearing filed concurrently herewith]**

17

18 Date:  To Be Set
   Time:  To Be Set
19 Place:  Courtroom 302
            3420 Twelfth Street
20            Riverside, California 92501

21

22

23

24

25

26

27

28

1

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1    **TO THE HONORABLE WAYNE E. JOHNSON, UNITED STATES**

2    **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND**

3    **OTHER PARTIES-IN-INTEREST:**

4    Copeland Properties Twelve, L.P., a California limited partnership ("Debtor") hereby

5    submits this Emergency Motion for Order Authorizing Interim Use of Cash Collateral

6    ("Motion") and in support of the Motion submit the following:

7    **I.    INTRODUCTION**

8    The Debtor owns and operates the real property located at 35-800 Bob Hope Drive,

9    Rancho Mirage, CA 92270 (the "Property"), a 12-unit commercial medical office building. The

10   Debtor's sole source of income is monthly rental payments from the units, which income is

11   generally received early each month.    The Property is currently 92.5% leased and generates

12   rents of over $118,000 per month, approximately $30,000 of which is paid directly to the

13   Debtor's vendors as pass-throughs to pay taxes, association fees, utilities, etc.

14   The Property is encumbered by a deed of trust in favor of Pacific Western Bank (the

15   "Bank") which was subsequently sold to German American Capital Corporation ("GACC")

16   which secures a loan with an estimated outstanding balance as of the Petition Date of

17   approximately $16.70 million (the "Loan").

18   Through this Motion, the Debtor seeks Court approval of the interim use of cash

19   collateral generated by the Property (the "Cash Collateral") and requests that a final hearing on

20   use of the Cash Collateral be set in approximately thirty (30) days.  The Debtor assumes that

21   GACC will assert that all money which originates from the tenants at the Property is part of its

22   Cash Collateral.

23   The Debtor proposes the following pertinent terms regarding the use of the Cash

24   Collateral.  Cash Collateral will be used only to pay those expenses that are necessary and

25   reasonable to preserve the value of the Property, including any pre-petition payments that are due

26   and outstanding for utilities on the Property, estimated to be approximately $200.  Such expenses

27   are set forth on the proposed budget attached as **Exhibit 1** to the accompanying Declaration of

28   Charles Copeland ("Copeland Declaration") (such expenses, the "Authorized Expenses," and

2

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1  such budget, the "Proposed Budget").   The Debtor has carefully evaluated which costs and

2  expenses associated with operating the Property are necessary to preserve the ongoing value of

3  the Property.   Although payment of necessary operating expenses, insurance, and taxes, itself

4  protects GACC by protecting its collateral, the Debtor has proposed additional adequate

5  protection to GACC in the form of monthly adequate protection payments in the amount of

6  $52,083.  The monthly payments are set forth in the Proposed Budget and are nearly equal to

7  monthly interest at the contractual non-default rate under the Note.

8          As further described below, the Debtor requires the immediate use of the Cash Collateral

9  to operate the Property for the benefit of all creditors and parties in interest so that it can preserve

10  the value of the Property and maximize ongoing revenue.  Without use of the Cash Collateral as

11  requested herein, the value of the Property will be detrimentally impacted because the Debtor

12  will not be able to meet the operational expectations of its tenants, thereby risking the immediate

13  and long-term loss of tenants, as well as exposing the estate to potential lawsuits and unnecessary

14  administrative claims.

15                      **II.      BACKGROUND INFORMATION**

16  **A.      Case Commencement**

17          The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code

18  on March 23, 2011.

19          The Debtor is continuing in possession of its property, and operating and managing its

20  business affairs as a debtor in possessions pursuant to Bankruptcy Code Sections 1107 and 1108.

21  **B.      Debtor's Background**

22          The Debtor was formed with the purpose to purchase the raw land and construct the

23  building on the Property. The Property has 12 units, 11 of which are currently occupied and the

24  Debtor has a newly signed tenant for which it will be seeking Court approval for tenant

25  improvements.   The proposed new tenancy will begin August 2011 and will generate an

26  additional over $18,000 of monthly income.  The Debtor's sole source of income is monthly

27  rental payments from the units, which income is generally received early each month.   The

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1   Property is managed by CWM Real Estate, which is the General Partner of the Debtor.  CWM

2   Real Estate currently does not collect a management fee.

3           The Property is currently 92.5% leased and generates rents of over $118,000 per month,

4   approximately $30,000 of which is paid directly to vendors of the Debtor as pass throughs.  All

5   of the Debtor's income is derived from rent collected on the Property.

6   **C.      Events Leading to the Chapter 11 Filing**

7           The filing of the bankruptcy was a result of an Ex Parte Application for the appointment

8   of a receiver filed and later related proceedings by GACC in the case of *German American*

9   *Capital Corporation v. Copeland Properties Twelve, L.P., et. al.,* pending in the Superior Court

10  for the State of California, County of Riverside, Case No. INC 110204 for Debtor's default under

11  the Loan.

12  **D.      Debt to German American Capital Corporation**

13          Due to the sale from the Bank to GACC of the Loan in or about March 2010, GACC is

14  the beneficiary and holder of that certain Promissory Note and Construction Loan Agreement

15  ("Note"), executed by the Debtor in favor of the Bank on or about July 12, 2006, pursuant to

16  which the Debtor promised to pay the Bank the principal sum of $13.265 million.  The Note had

17  an original maturity date of January 12, 2008 (the "Original Maturity Date") but has been

18  extended pursuant to multiple Change in Terms Agreements and/or Forbearance Agreements.

19  The Original Maturity Date has been extended to March 12, 2010.  Pursuant to the Note, the

20  outstanding principal balance of the Note, together with all accrued and unpaid interest and all

21  other amounts due and owing, were due and payable in full on the Original Maturity Date.  A

22  true and correct copy of the Note and all related agreements to extend the Original Maturity Date

23  are attached to the Copeland Declaration as **Exhibit 2**.

24          GACC is also the beneficiary and holder of that certain Construction Deed of Trust with

25  Assignment of Rents ("Deed of Trust"), executed by the Debtor as trustor in favor of the Bank as

26  beneficiary on or about July 12, 2006 and duly recorded on July 16, 2006 as Document No.

27  2006-0544842 in the Official Records of Riverside County, California, and subsequently

28  amended by that certain Modification of Deed of Trust dated May 1, 2008 and duly recorded on

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

May 5, 2008 Document No. 2008-0231284 in the Official Records of Riverside County, California. The Deed of Trust purports to encumber the Property and all improvements thereon. The Deed of Trust also purports to assign all existing and future rents and profits and income from the Property. A true and correct copy of the Deed of Trust and the Modification is attached to the Copeland Declaration as **Exhibit 3.**

In connection with the Loan, the Debtor also executed a Commercial Security Agreement dated July 12, 2006 granting a security interest to the Bank (now GACC) of the Property, including the personal property located at the Property, as well as other property described in the Security Agreement. The Loan is guaranteed by Donald E. Copeland, Charles Copeland, Janet Ihde, David Conston, and Rancho Mirage Surgery Center, LLC pursuant to separate Commercial Guaranty agreements dated July 12, 2006, May 1, 2008, November 4, 2008, and May 21, 2009.

On or about May 1, 2008, pursuant to a Change in Terms Agreement, the principal amount of the Note was increased from $13,285 million to $16.070 million account for tenant improvements made on the Property related to building the Rancho Mirage Surgery Center.

GACC purchased the Loan in March 2010 and the parties entered into a Forbearance Agreement in July 2010 which was effective June 2010. The agreement provided for the Loan to be extended to September 30, 2010 so long as the Debtor paid GACC 8% interest on the Loan going forward, executed a deed in lieu of foreclosure as security to GACC if the Debtor defaulted, and brought the taxes on the Property current. The Debtor performed, but was unable to refinance the debt prior to September 30, 2010. Pursuant to two additional extensions, each of which required the Debtor to pay GACC the sum of $75,000 in addition to the monthly interest payment at 8%, the Loan was extended to December 15, 2010. The Debtor was unable to extend the Loan again and defaulted under the Loan as of December 1, 2010.

**E.    Cause Exists to Grant the Motion**

The Debtor believes that in time a consensual use of Cash Collateral will be achieved. Unfortunately, the Debtor cannot survive and operate without the immediate use of cash pending the outcome of those discussions and pending a final hearing on use of Cash Collateral. Rather

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1  than voluntarily cease paying the expenses in connection with the Property, the present Motion is

2  required.

3      If the Debtor is not immediately authorized to use the Cash Collateral, the Debtor will be

4  unable to pay necessary expenses such as utilities, maintenance, repairs, and other expenses

5  identified on the Proposed Budget.  Thus, the avoidance of such an interruption is a significant

6  benefit for all creditors and parties in interest.  Such operations are the Debtor's sole source of

7  income and the amount of such income determines in large part the asset value of the Property.

8  Indeed, such expenditures benefit GACC by preserving the value of its collateral.

9      Based on all of the above, the Debtor submits that all of the expenses it proposes to pay

10  from the Cash Collateral in accordance with the Proposed Budget are necessary to carry the

11  Debtor through the interim period and will allow for the orderly and efficient operations during

12  the Chapter 11 case.  The Debtor believes that GACC is aware of the harm that could be caused

13  to the Debtor and its assets absent the reasonable use of Cash Collateral proposed herein.  In

14  order to prevent immediate harm the Debtor requests it be authorized to use Cash Collateral

15  pursuant to the Proposed Budget.

16      If the Debtor does not continue to operate the Property as expected by its tenants, the

17  Debtor will suffer immediate harm due to the ensuing legal and financial loses that will result

18  from tenants who are contractually entitled to a certain level of operations at the location.  The

19  challenges to maintain high rates of tenant occupancy and rent collection are difficult enough

20  without interruption of repairs, maintenance, security, deposit refunds, and other services

21  reasonably anticipated by the tenants.  The Debtor believes that GACC is aware of the harm that

22  could be caused to the Debtor and to the Property absent the reasonable use of Cash Collateral

23  proposed herein.  In order to prevent the immediate harm to the Property, the Debtor thus

24  requests it be authorized to use Cash Collateral pursuant to the Proposed Budget.

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

### III.    MEMORANDUM OF POINTS AND AUTHORITIES

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.[1]  Section 363(c)(1) permits a debtor to use, sell or lease property in the ordinary course of business.  However, Section 363(c)(3) imposes an absolute prohibition on the use, sale or lease of cash collateral unless (1) the creditor with an interest in the collateral consents, or (2) the court authorizes the use after notice and a hearing.

Cash collateral is defined in section 363(a) as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . . ."  GACC asserts an interest in the Debtor's assets and in rents collected from the operation of the Property.

Absent the consent of the secured party, the use of cash collateral is authorized only to the extent it is used to pay the actual and necessary expenses of operation.  *Matter of Plaza Family Partnership*, 95 B.R. 166 (E.D. Cal. 1989); *In re MadCat Two, Inc.,* 120 B.R. 990 (Bankr E.D. Ark. 1990). The Debtor submits that all of the expenses that the Debtor proposes to pay from the Cash Collateral in accordance with the Proposed Budget are necessary to the operation of the Property, including certain pre-petition utility bills that could not be paid because of the freezing of the Debtor's bank account.

Pursuant to Section 363(e) of the Bankruptcy Code, the Court may condition the use of property, including cash collateral, as necessary to provide adequate protection of an entity's interest in such cash collateral.  Adequate protection is intended to accommodate for the risk of "decrease in the value of [the secured creditor's] interest in such property."  A debtor has the burden of proof with respect to establishing the sufficiency of adequate protection.

---

[1]    Section 363(c) provides:

(1)    If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1    Generally, adequate protection is sought where the collateral is expected to depreciate

2  during the course of the bankruptcy, either through use or time.  *In re George Ruggiere*

3  *Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984). The question of whether a

4  secured party's interest in collateral is adequately protected, by its nature, must be determined on

5  a case-by-case basis.  *In re Belco, Inc.,* 38 B.R. 525, 527 (Bankr. W.D. Ok. 1984).

6    To determine whether a secured party's interest in cash collateral is adequately protected

7  the court must determine (1) the value of the cash collateral, and (2) whether the proposed use of

8  the cash collateral threatens such value.  *George Ruggiere*, 727 F.2d at 1020; *see, also, United*

9  *Savings Association of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 108 S.Ct.

10  626, 630 (1988).  If the collateral in which the creditor has a security interest is worth less than

11  the amount owed to the creditor, the Debtor must only provide adequate compensation to the

12  extent that the value of the collateral is decreasing.  *Timbers,* 108 S.Ct. at 629; *In re McCombs*

13  *Properties VI, Ltd.*, 88 B.R. 261, 266 (Bankr. C.D. Cal. 1988) (post-*Timbers* case; adequate

14  protection must be provided if the value of the collateral is likely to diminish during the time the

15  cash collateral is used).

16    GACC's security interest purportedly extends to the Debtor's assets and the income

17  generated from the Property.  The Debtor does not believe based on its discussions with

18  professionals and with their own familiarity with the Property that GACC's collateral is

19  declining in value.  If the Debtor is authorized to use Cash Collateral and pay GACC on the

20  terms proposed in the Motion, the Debtor believes that the collection of rental proceeds from the

21  operations can continue to be collected uninterrupted at the same level they were collected pre-

22  petition and the expenses necessary to preserve GACC's collateral can be paid.  In other words,

23  it is the use of Cash Collateral that ensures GACC is adequately protected.

24    The Debtor's purpose for requesting the use of the Cash Collateral is the preservation of

25  the Property against any diminution in value.  The right to use the Cash Collateral for this

26  purpose is well-recognized.  *See, e.g., In re Marion Street Partnership*, 108 B.R. 218, 227

27  (Bankr. D. Minn. 1989) (allowed the debtor to use the cash collateral to pay the ordinary

28  expenses and management fees without requiring further adequate protection); *In re Orlando*

8

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1   *Trout Creek Ranch*, 80 B.R. 190, 192 (Bankr. N.D. Cal. 1987) (adequate protection exists when

2   the debtor uses cash collateral for its ordinary and necessary operating expenses so long as the

3   value of the underlying collateral is maintained); *Stein v. United States Farmers Home Adm. (In*

4   *re Stein),* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (use of cash collateral authorized despite

5   creditor being undersecured when such use was necessary to the continued operations of the

6   debtor); *Hartigan v. Pine Lake Village Apartment Co. (In re Pine Lake Village Apartment Co.)*,

7   16 B.R. 750, 756-57 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated

8   from rental income to enhance the value of real property which also secured creditor's claim).

9       The use of Cash Collateral pursuant to the terms set forth above is justified in these cases

10   because, absent the use of the Cash Collateral, the Debtor will suffer immediate and irreparable

11   harm and the value of the assets will suffer, all to the injury of the estate's creditors, including

12   GACC.

13       Pursuant to Federal Rule of Bankruptcy Procedure 4001, the Court may grant the

14   Debtor's request to use the Cash Collateral on an interim basis subject to a final hearing on the

15   Motion.  As noted, the Debtor will be unable to pay its expenses absent the use of the Cash

16   Collateral.  Accordingly, the Debtor requests that the Court set a final hearing on the Motion

17   approximately thirty days after entry of an order approving the Debtor's interim use of the Cash

18   Collateral so that all parties will have ample notice and opportunity to respond to the Motion.

19                **IV.   CONCLUSION**

20       **WHEREFORE,** based upon the foregoing, and any other evidence duly admitted at the

21   hearing on the Motion, the Debtor respectfully submits that good cause exists to grant this

22   Motion and request that the Court enter an order which provide as follows:

23       1.     Authorizing the Debtor to use Cash Collateral consistent with the Proposed

24   Budget attached as **Exhibits 1** to the Declaration of Charles Copeland.

25       2.     Authorizing the Debtor to make adequate protection payments to GACC as set

26   forth in the Proposed Budget.

27       3.     Setting a final hearing on use of Cash Collateral for approximately thirty days

28   from entry of the order granting the Motion.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1    4.    Authorizing the Debtor to sign such documents and carry out such actions as are

2  consistent with the purpose of the Motion.

3    5.    And for such other and further relief as the Court deems just and proper.

4

5                                    Respectfully submitted,

6  Dated:  March 25, 2011          **SHULMAN HODGES & BASTIAN LLP**

7

8                                    /s/ Melissa R. Davis

9                                    Leonard M. Shulman
                                     Melissa R. Davis
10                                   Proposed Insolvency Counsel for
                                     Debtor and Debtor in Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

# DECLARATION OF CHARLES COPELAND

I, Charles Copeland, declare as follows:

1.    I am the an Officer of the General Partner of Copeland Properties Twelve, LP., a California limited partnership, the debtor and debtor in possession herein ("Debtor"), and am one of the persons responsible for the administration of the Debtor.  I have personal knowledge of the facts set forth herein and could, if called as a witness, competently testify thereto.  I am also personally familiar with, and am custodian of, the records of the Debtor as they pertain to the financial records set forth herein.  The records of the Debtor are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.

2.    I make this Declaration in support of the Debtor's Emergency Motion for Order Authorizing Interim Use of Cash Collateral  ("Motion").  Unless otherwise noted, capitalized terms herein have the meaning as set forth in the Motion.

3.    The Debtor is proposing to use Cash Collateral to pay those expenses that are necessary and reasonable to preserve the value of their businesses and assets.  Such expenses are set forth on the proposed budget attached hereto as **Exhibit 1**.  I have carefully evaluated which costs and expenses associated with operating the Property are necessary to preserve the ongoing value of the Property.  The budget includes the payment of certain pre-petition utility bills whose payments bounced because of the freezing of the Debtor's bank account.

4.    The Debtor was formed to purchase the raw land and construct the building on the Property.  The Property has 12 units, 11 of which are currently occupied.  The Debtor also has an additional potential tent, of which the Debtor will be seeking Court approval.  The monthly base rent for all tenants currently is approximately $118,000, approximately $30,000 is paid directly for taxes, association charges, etc.  In addition, the Debtor is proposing a new tenant for the vacant space which will generate an additional over $18,000 of monthly income.  The Debtor will be seeking Court approval to confirm and approve the lease and tenant improvements.  All of the Debtor's income is derived from rent collected on the Property.

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

5. The filing of the bankruptcy was a result of proceedings in the case of German American Capital Corporation v. Copeland Properties Twelve, L.P., et. al., pending in the Superior Court for the State of California, County of Riverside, Case No. INC 1102045 to appoint a receiver and the Debtor's inability to make payments on the Loan.

6. Due to the sale from the Bank to GACC of the Loan in or about March 2010, GACC is the beneficiary and holder of that certain Promissory Note and Construction Loan Agreement ("Note"), executed by the Debtor in favor of the Bank on or about July 12, 2006, pursuant to which the Debtor promised to pay the Bank the principal sum of $13.265 million. The Note had an original maturity date of January 12, 2008 (the "Original Maturity Date") but has been extended pursuant to multiple Change in Terms Agreements and Forbearance Agreements. The Original Maturity Date has been extended to March 12, 2010. Pursuant to the Note, the outstanding principal balance of the Note, together with all accrued and unpaid interest and all other amounts due and owing, were due and payable in full on the Original Maturity Date. A true and correct copy of the Note and all Change in Terms Agreements and Forbearance Agreements are attached hereto as **Exhibit 2**.

7. GACC is also the beneficiary and holder of that certain Construction Deed of Trust with Assignment of Rents ("Deed of Trust"), executed by the Debtor as trustor in favor of the Bank as beneficiary on or about July 12, 2006 and duly recorded on July 16, 2006 as Document No. 2006-0544842 in the Official Records of Riverside County, California, and subsequently amended by that certain Modification of Deed of Trust dated May 1, 2008 and duly recorded on May 5, 2008 Document No. 2008-0231284 in the Official Records of Riverside County, California. The Deed of Trust purports to encumber the Property and all improvements thereon. The Deed of Trust also purports to assign all existing and future rents and profits and income from the Property. A true and correct copy of the Deed of Trust and the Modification are attached hereto as **Exhibit 3.**

8. In connection with the Loan, the Debtor also executed a Commercial Security Agreement dated July 12, 2006 granting a security interest to the Bank (now GACC) of the Property, including the personal property located at the Property, as well as other property

12

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1  described in the Security Agreement.  The Loan is guaranteed by Donald E. Copeland, Charles

2  Copeland, Janet Ihde, David Conston, and Rancho Mirage Surgery Center, LLC pursuant to

3  separate Commercial Guaranty agreements dated July 12, 2006, May 1, 2008, November 4,

4  2008, and May 21, 2009.

5        9.      On or about May 1, 2008, pursuant to a Change in Terms Agreement,  the

6  principal amount of the Note was increased from $13.285 million to $16.070 million to account

7  for tenant improvements made on the Property related to building the Rancho Mirage Surgery

8  Center.

9        10.     GACC purchased the Loan in March 2010 and the parties entered into a

10  Forbearance Agreement in July 2010 which was effective June 2010 which provided for the

11  Loan to be extended to September 30, 2010 provided the Debtor pay GACC 8% interest on the

12  Loan going forward, execute a deed in lieu of foreclosure as security to GACC if the Debtor

13  defaulted, and bring the taxes on the Property current.  The Debtor did such, but was unable to

14  refinance the debt prior to September 30, 2010.  Pursuant to two additional extensions, each of

15  which required the Debtor to pay GACC the sum of $75,000 in addition to the monthly interest

16  payment at 8%, the Loan was extended to December 15, 2010.  The Debtor was unable to extend

17  the Loan again and defaulted under the Loan as of December 1, 2010.

18        11.     The Debtor cannot survive and operate without the immediate use of Cash

19  Collateral and will be unable to pay necessary expenses such as utilities, maintenance, repairs,

20  and other expenses identified on the Proposed Budget.

21        12.     I submit that all of the expenses the Debtor propose to pay from the Cash

22  Collateral in accordance with the Proposed Budget are necessary to carry the Debtor through the

23  ///

24  ///

25  ///

26

27

28

13

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

1   interim period and will allow for the orderly and efficient operations during the Chapter 11 cases.

2   In order to prevent immediate harm I request that the Debtor be authorized to use Cash Collateral

3   pursuant to the Proposed Budget attached hereto as **Exhibit 1**.

4        I declare under penalty of perjury under the laws of the United States of America that the

5   foregoing is true and correct.

6        Executed on March 25, 2011, at _____ Redlands _____ California.

7

8        Charles Copeland

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

G:\Wp\Cases\C-D\Copeland Properties Twelve\Pld\Cash Collateral Motion.doc

# EXHIBIT 1

**Copeland Properties Twelve, L.P. 12 100 Day Street, Rancho Midge, CA**

## 2011 OPERATING BUDGET

| | YEAR | MONTH | SQ FT-YR | Comments |
|---|---|---|---|---|
| **RMPPOA ASSESSMENT** | 129,500 | 10,792 | 2.59576 | |
| | | | | |
| **PROFESSIONAL** | | | | |
| **INSURANCE** | | | | |
| Commercial Package for CP 12 | 6,725 | 560 | 0.13480 | |
| **MANAGEMENT** | 0 | 0 | 0.00000 | Included in Assessment |
| **Sub-Total:** | **6,725** | **560** | **0.1348** | |
| | | | | |
| **MORTGAGE** | | | | |
| German American Capital Corporation | 625,000 | 52,083 | 12.52781 | |
| | | | | |
| **OPERATIONS** | | | | |
| **CLEANING & JANITORIAL** | | | | |
| Interior Common Areas - 5 Days | 9,000 | 750 | 0.18040 | 5 Days per week |
| Windows - As Requested (Quarterly) | 0 | 0 | 0.00000 | Included in Assessment |
| Awnings - As Requested (Quarterly) | 0 | 0 | 0.00000 | Included in Assessment |
| Sidewalk Cleaning (Quarterly) | 0 | 0 | 0.00000 | Included in Assessment |
| Toiletries and Cleaning Supplies | 900 | 75 | 0.01804 | |
| Carpet Cleaning | 7,200 | 600 | 0.14432 | Weekly dryclean / 2x full |
| **LANDSCAPING** | | | | |
| Service contract (twice a week) | 0 | 0 | 0.00000 | Included in Assessment |
| Yearly Scalping/Seeding - Materials | 0 | 0 | 0.00000 | Included in Assessment |
| Palm Tree Trimming | 0 | 0 | 0.00000 | Included in Assessment |
| Irrigation Repairs (Material) | 0 | 0 | 0.00000 | Included in Assessment |
| Irrigation Repairs (Labor) | 0 | 0 | 0.00000 | Included in Assessment |
| Replacement Plants & Materials | 0 | 0 | 0.00000 | Included in Assessment |
| | | | | |
| **LIGHTING** | | | | |
| Interior Light bulbs and replacement - Materials & Labor | 500 | 42 | 0.01002 | |
| Exterior Lighting Inspection - Contract | 0 | 0 | 0.00000 | Included in Assessment |
| Exterior Light bulbs and replacement - Labor | 0 | 0 | 0.00000 | Included in Assessment |
| Exterior Light bulbs and replacement - Materials | 0 | 0 | 0.00000 | Included in Assessment |
| **SIGNAGE** | | | | |
| Interior Signage & Upgrades | 0 | 0 | 0.00000 | |
| Exterior Monument with Updated Addresses | 0 | 0 | 0.00000 | Included in Assessment |
| | | | | |
| **WATER FEATURE** | | | | |
| Monthly Service | 0 | 0 | 0.00000 | Included in Assessment |
| Annual Drain and Clean | 0 | 0 | 0.00000 | Included in Assessment |
| **PEST CONTROL SERVICE (Monthly & As Needed)** | 0 | 0 | 0.00000 | Included in Assessment |
| **REPAIRS & MAINTENANCE** | 5,000 | 417 | 0.10022 | |
| **ELEVATOR** | | | | |
| Maintenance (Quarterly) | 5,108 | 426 | 0.10239 | |
| Permits (Annual) | 450 | 38 | 0.00902 | |
| **HVAC** | | | | |
| Service of 6 Common area units (Quarterly) | 960 | 80 | 0.01924 | |
| Repairs - Materials & Labor | 1,000 | 83 | 0.02004 | |
| **ROOF** | | | | |
| Annual inspection and repairs | 1,000 | 83 | 0.02004 | |
| **PARKING LOT MAINTENANCE** | 0 | 0 | 0.00000 | Included in Assessment |
| **FIRE MONITORING** | 0 | 0 | 0.00000 | Included in Assessment |
| **FIRE EXTINGUISHERS** | | | | |
| Annual Recertification | 800 | 67 | 0.01604 | |
| **ANNUAL FIRE INSPECTION** | 500 | 41.67 | 0.01002 | |
| | | | | |
| **TAXES** | | | | |
| Property Tax | 201,131 | 16,761 | 4.03158 | |
| Corporate Tax (Association) | 0 | 0 | 0.00000 | Included in Assessment |
| **Sub-Total:** | **233,549** | **19,462** | **4.6814** | |
| | | | | |
| **UTILITIES** | | | | |
| **ELECTRICITY (1 Meter)** | | | | |
| House Meter 1 | 11,400 | 950 | 0.22851 | |
| REFUSE (1 Trash & 2 Recycle (NC) T,W,Th,F) | 5,465 | 455 | 0.10954 | |
| TELEPHONE (5 lines) | 2,350 | 196 | 0.04710 | |
| WATER (2 meters) | 5,600 | 467 | 0.11225 | |
| **Sub-Total:** | **$24,815** | **$2,068** | **$0.4974** | |
| | | | | |
| **OPERATING EXPENSE** | **1,019,589** | **84,966** | **20.43716** | |
| RESERVE FUNDING (Association) | 0 | 0 | 0.00000 | Included in Assessment |
| **TOTAL EXPENSE** | **$1,019,589** | **$84,966** | **$20.4372** | |

**EXHIBIT "1"**

# EXHIBIT 2

 **PROMISSORY NOTE** 

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $13,265,000.00 | 07-12-2006 | 01-12-2008 | 16041021 | | Port #574474 | 206 | X |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Copeland Properties Twelve, LP, a California limited
partnership
25809 Business Center Drive, Suite F
Redlands, CA 92374

**Lender:**  Pacific Western National Bank
Palm Springs Office
601 East Tahquitz Canyon Way
Palm Springs, CA 92262

---

**Principal Amount: $13,265,000.00**          **Initial Rate: 8.750%**          **Date of Note: July 12, 2006**

**PROMISE TO PAY.** Copeland Properties Twelve, LP, a California limited partnership ("Borrower") promises to pay to Pacific Western National Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Thirteen Million Two Hundred Sixty-five Thousand & 00/100 Dollars ($13,265,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 12, 2008. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 12, 2006, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is the Lender's Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.250%. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 8.750%. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Pacific Western National Bank, Palm Springs Office, 601 East Tahquitz Canyon Way, Palm Springs, CA 92262.

**INTEREST RESERVES.** Borrower authorizes Lender to place $770,292.00 of the Principal Amount as an interest reserve, which is an estimate of the interest due on the Note ("Interest Reserve"). All interest payments shall be paid from the Interest Reserve. Lender may automatically deduct accrued unpaid interest from the Interest Reserve. Interest will accrue, as described in this Note, on amounts deducted from the Interest Reserve. In the event the interest due under this Note exceeds the Interest Reserve, Borrower will pay accrued unpaid interest when due according to the terms of this Note. Upon maturity, Lender will not advance or disburse the remaining Interest Reserve, if any, to Borrower. The principal due upon maturity will not include any remaining Interest Reserve.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $10.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, the variable interest rate on this Note shall immediately increase to 5.500 percentage points over the Index, if permitted under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or

**EXHIBIT "2"**



**PROMISSORY NOTE**
**(Continued)**

Loan No: 16041021                                                                                                                Page 2

a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.  In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Events Affecting General Partner of Borrower.**  Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change In Ownership.**  The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.**  If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default:  (1)  cures the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.**  Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.**  Lender may hire or pay someone else to help collect this Note if Borrower does not pay.  Borrower will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.  This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Note has been accepted by Lender in the State of California.**

**CHOICE OF VENUE.**  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Riverside County, State of California.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.**  Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A)  a Construction Deed of Trust dated July 12, 2006, to a trustee in favor of Lender on real property located in Riverside County, State of California.  That agreement contains the following due on sale provision:  Lender may, at Lender's option, declare immediately due and payable all sums secured by the Construction Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property.  A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property.  If any Borrower is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower.  However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B)  an Assignment of All Rents to Lender on real property located in Riverside County, State of California.

**LINE OF CREDIT.**  This Note evidences a straight line of credit.  Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances.  Advances under this Note may be requested only in writing by Borrower or as provided in this paragraph.  All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above.  The following person currently is authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of his or her authority:  Authorized Agent.  Borrower agrees to be liable for all sums either:  (A)  advanced in accordance with the instructions of an authorized person or  (B)  credited to any of Borrower's accounts with Lender.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.**  Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency.  Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Pacific Western National Bank Loan Servicing Department P. O. Box 131207 Carlsbad, CA 92013-1207.

**GENERAL PROVISIONS.**  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

**EXHIBIT "2"**



**PROMISSORY NOTE**
**(Continued)**

Loan No: 16041021                                                                                 Page 3

---

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:


COPELAND PROPERTIES TWELVE, LP, A CALIFORNIA LIMITED PARTNERSHIP


COPELAND REALTY, INC., A CALIFORNIA CORPORATION, Managing General Partner of Copeland Properties Twelve, LP, a California limited partnership

By: _____
Donald  E.  Copeland,  President/Secretary  of
Copeland Realty, Inc., a California corporation

---

LASER PRO Lending, Ver. 5.39.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  E:\HARPWHR\CFI\WIN\CFI\LPL\D20.FC  TR-5310  PR-12

**EXHIBIT "2"**

### ALLONGE TO PROMISSORY NOTE

The Promissory Note, and all amendments and/or modifications thereto, to which this allonge is attached, dated July 12, 2006, and made by Copeland Properties Twelve, L.P., a California limited partnership, in the original principal sum of Thirteen Million Two Hundred Sixty Five Thousand Dollars and 00/100 ($13,265,000.00) in favor of  by Pacific Western Bank, a California state-chartered bank, ("**PB**") is hereby endorsed and assigned (including all beneficial rights thereunder) by PB, the undersigned, to German American Capital Corporation, a Maryland corporation ("**GACC**"), without recourse or warranty of any kind or nature except as may be specifically set forth in that certain Loan Sale Agreement dated as of February 23, 2010 between GACC and PB.

PAY TO THE ORDER OF: German American Capital Corporation, a Maryland corporation

Dated: February 23, 2010

PACIFIC WESTERN BANK,
a California state-chartered bank

By: _____
Name:   Jared M. Wolff
Its:      Authorized Representative

Allonge to Promissory Note 11/30/06

### EXHIBIT "2"

# CONSTRUCTION LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $13,265,000.00 | 07-12-2006 | 01-12-2008 | 16041021 | | Port #574474 | 206 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| | |
|---|---|
| **Borrower:** Copeland Properties Twelve, LP, a California limited partnership<br>25809 Business Center Drive, Suite F<br>Redlands, CA  92374 | **Lender:** Pacific Western National Bank<br>Palm Springs Office<br>601 East Tahquitz Canyon Way<br>Palm Springs, CA  92262 |

**THIS CONSTRUCTION LOAN AGREEMENT** dated July 12, 2006, is made and executed between Copeland Properties Twelve, LP, a California limited partnership ("Borrower") and Pacific Western National Bank ("Lender") on the following terms and conditions. Borrower has applied to Lender for one or more loans for purposes of constructing the Improvements on the Real Property described below. Lender is willing to lend the loan amount to Borrower solely under the terms and conditions specified in this Agreement and in the Related Documents, to each of which Borrower agrees. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and (B) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of July 12, 2006, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person currently is authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of his or her authority: **Authorized Agent.**

**LOAN.** The Loan shall be in an amount not to exceed the principal sum of  **U.S. $13,265,000.00** and shall bear interest on so much of the principal sum as shall be advanced pursuant to the terms of this Agreement and the Related Documents. The Loan shall bear interest on each Advance from the date of the Advance in accordance with the terms of the Note. Borrower shall use the Loan Funds solely for the payment of: (A) the costs of constructing the Improvements and equipping the Project in accordance with the Construction Contract; (B) other costs and expenses incurred or to be incurred in connection with the construction of the Improvements as Lender in its sole discretion shall approve; and (C) if permitted by Lender, interest due under the Note, including all expenses and all loan and commitment fees described in this Agreement. The Loan amount shall be subject at all times to all maximum limits and conditions set forth in this Agreement or in any of the Related Documents, including without limitation, any limits relating to loan to value ratios and acquisition and Project costs.

**PROJECT DESCRIPTION.** The word "Project" as used in this Agreement means the construction and completion of all Improvements contemplated by this Agreement, including without limitation the erection of the building or structure on the Real Property identified to this Agreement by Borrower and Lender, installation of equipment and fixtures, landscaping, and all other work necessary to make the Project usable and complete for the intended purposes. The Project includes the following work:

Construction of a two-story class "A" medical office building in Rancho Mirage.

The word "Property" as used in this Agreement means the Real Property together with all Improvements, all equipment, fixtures, and other articles of personal property now or subsequently attached or affixed to the Real Property, together with all accessions, parts, and additions to, all replacements of, and all substitutions for any of such property, and all proceeds (including insurance proceeds and refunds of premiums) from any sale or other disposition of such property. The real estate described below constitutes the Real Property as used in this Agreement.

The real estate legally described as:
PARCEL 2 AND LETTERED LOT C OF PARCEL MAP 30677, AS SHOWN BY MAP ON FILE IN BOOK 208 PAGE(S) 82 AND 83, OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, AS MORE FULLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF BY THIS REFERENCE.

Its address is commonly known as:
Real Property located at 35-800 Bob Hope Drive, Rancho Mirage, CA 92270.

**FEES AND EXPENSES.** As a condition of Lender making the Loan, Borrower agrees to pay the following fees, charges, and expenses, in addition to all others set forth in this Agreement: **Loan Fees, Loan Processing Fees, Fund Control Fee, Title Policy, Recording Fees, Appraisal Fee, Inspection Fee, Fire Insurance Premium and any other O ⁶-of-Pocket Expenses.** Whether or not the Project shall be consummated, Borrower shall assume and pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including without limitation the following: (A) all closing costs, loan fees, and disbursements; (B) all expenses of Lender's legal counsel; and (C) all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**NO CONSTRUCTION PRIOR TO RECORDING OF SECURITY DOCUMENT.** Borrower will not permit any work or materials to be furnished in connection with the Project until (A) Borrower has signed the Related Documents; (B) Lender's mortgage or deed of trust and other Security Interests in the Property have been duly recorded and perfected; (C) Lender has been provided evidence, satisfactory to Lender, that Borrower has obtained all insurance required under this Agreement or any Related Documents and that Lender's liens on the Property and Improvements are valid perfected first liens, subject only to such exceptions, if any, acceptable to Lender.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Organization. Borrower is a partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 25809 Business Center Drive, Suite F, Redlands, CA  92374. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**EXHIBIT "2"**

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 16041021                                                                                  Page 2

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Title to Property.** Borrower has, or on the date of first disbursement of Loan proceeds will have, good and marketable title to the Collateral free and clear of all defects, liens, and encumbrances, excepting only liens for taxes, assessments, or governmental charges or levies not yet delinquent or payable without penalty or interest, and such liens and encumbrances as may be approved in writing by the Lender. The Collateral is contiguous to publicly dedicated streets, roads, or highways providing access to the Collateral.

**Project Costs.** The total cost for the Project shall not exceed $16,488,650.00. The Project costs are true and accurate estimates of the costs necessary to complete the Improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Improvements from exceeding the Project costs.

**Utility Services.** All utility services appropriate to the use of the Project after completion of construction are available at the boundaries of the Collateral.

**Assessment of Property.** The Collateral is and will continue to be assessed and taxed as an independent parcel by all governmental authorities.

**Compliance with Governing Authorities.** Borrower has examined and is familiar with all the easements, covenants, conditions, restrictions, reservations, building laws, zoning ordinances, and federal, state, and local requirements affecting the Project. The Project will at all times and in all respects conform to and comply with the requirements of such easements, covenants, conditions, restrictions, reservations, building laws, regulations, zoning ordinances, and federal, state, and local requirements.

**EXHIBIT "2"**

**CONSTRUCTION LOAN AGREEMENT**

**(Continued)**

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Special Conditions to Initial Advance.** All advances are subject to an inspection prior to release of funds.

**Equity Funds.** Borrower shall provide evidence of equity funds totaling **$3,223,650.00** prior to the initial advance from the Loan Fund. Lender may, at Lender's option, require that the equity funds be deposited with Lender as a portion of the Loan Fund, which funds shall be disbursed prior to any Loan proceeds.

**Approval of Contractors, Subcontractors, and Materialmen.** Lender shall have approved a list of all contractors employed in connection with the construction of the Improvements, showing the name, address, and telephone number of each contractor, a general description of the nature of the work to be done, the labor and materials to be supplied, the names of materialmen, if known, and the approximate dollar value of the labor, work, or materials with respect to each contractor or materialman. Lender shall have the right to communicate with any person to verify the facts disclosed by the list or by any application for any Advance, or for any other purpose.

**Plans, Specifications, and Permits.** Lender shall have received and accepted a complete set of written Plans and Specifications setting forth all Improvements for the Project, and Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and use of the Project.

**Architect's and Construction Contracts.** Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

**Related and Support Documents.** Borrower shall provide to Lender in form satisfactory to Lender the following support documents for the Loan: Assignment of Architect's Contract, Assignment of Construction Contract and Completion Guaranty.

**Budget and Schedule of Estimated Advances.** Lender shall have approved detailed budget and cash flow projections of total Project costs and a schedule of the estimated amount and time of disbursements of each Advance.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the consummation of the Project and duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, in their sole discretion, may require.

**Bond.** If requested by Lender, Borrower shall have furnished a performance and payment bond in an amount equal to 100% of the amount of the Construction Contract, as well as a materialmen's and mechanics' payment bond, with such riders and supplements as Lender may require, each in form and substance satisfactory to Lender, naming the General Contractor as principal and Lender as an additional obligee. Any required bonds and the contracts which they cover must be duly recorded or filed in accordance with California Civil Code Section 3235, if required by Lender.

**Appraisal.** If required by Lender, an appraisal shall be prepared for the Property, at Borrower's expense, which in form and substance shall be satisfactory to Lender, in Lender's sole discretion, including applicable regulatory requirements.

**Plans and Specifications.** If requested by Lender, Borrower shall have assigned to Lender on Lender's forms the Plans and Specifications for the Project.

**Environmental Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expense, an environmental report and certificate on the Property in form and substance satisfactory to Lender, prepared by an engineer or other expert satisfactory to Lender stating that the Property complies with all applicable provisions and requirements of the "Hazardous Substances" paragraph set forth in this Agreement.

**Soil Report.** If requested by Lender, Borrower shall have furnished to Lender, at Borrower's expenses, a soil report for the Property in form and substance satisfactory to Lender, prepared by a registered engineer satisfactory to Lender stating that the Property is free from soil or other geological conditions that would preclude its use or development as contemplated without extra expense for precautionary, corrective or remedial measures.

**Survey.** If requested by Lender, Borrower shall have furnished to Lender a survey of recent date, prepared and certified by a qualified surveyor and providing that the Improvements, if constructed in accordance with the Plans and Specifications, shall lie wholly within the boundaries of the Collateral without encroachment or violation of any zoning ordinances, building codes or regulations, or setback requirements, together with such other information as Lender in its sole discretion may require.

**Zoning.** Borrower shall have furnished evidence satisfactory to Lender that the Collateral is duly and validly zoned for the construction, maintenance, and operation of the Project.

**Title Insurance.** Borrower shall have provided to Lender an ALTA Lender's extended coverage policy of title insurance with such endorsements as Lender may require, issued by a title insurance company acceptable to Lender and in a form, amount, and content satisfactory to Lender, insuring or agreeing to insure that Lender's security agreement or other security document on the Property is or will be upon recordation a valid first lien on the Property free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by Lender in writing. If requested by Lender, Borrower shall provide to Lender, at Borrower's expense, a foundation endorsement (CLTA 102.5 or its equivalent) to the title policy upon the completion of each foundation for the Improvements, showing no encroachments, and upon completion an endorsement which insures the lien-free completion of the Improvements (CLTA 101 series, as required by Lender). Specifically, Borrower shall provide to Lender the following title insurance endorsements: **102.5.**

**Insurance.** Unless waived by Lender in writing, Borrower shall have delivered to Lender the following insurance policies or evidence thereof: (a) an all risks course of construction insurance policy (builder's risk), with extended coverage covering the Improvements issued in an amount and by a company acceptable to Lender, containing a loss payable or other endorsement satisfactory to Lender insuring Lender as mortgagee, together with such other endorsements as may be required by Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender; (b) owners and General Contractor general liability insurance, public liability and workmen's compensation insurance; (c) flood insurance if required by Lender or applicable law; and (d) all

**EXHIBIT "2"**

CONSTRUCTION LOAN AGREEMENT
(Continued)

other insurance required by this Agreement or by the Related Documents.

**Workers' Compensation Coverage.** Provide to Lender proof of the General Contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Project.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Satisfactory Construction.** All work usually done at the stage of construction for which disbursement is requested shall have been done in a good and workmanlike manner and all materials and fixtures usually furnished and installed at that stage of construction shall have been furnished and installed, all in compliance with the Plans and Specifications. Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

**Certification.** Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified inspector acceptable to Lender that the construction of the Improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations, and similar requirements.

**Lien Waivers.** Borrower shall have obtained and attached to each application for an Advance, including the Advance to cover final payment to the General Contractor, executed acknowledgments of payments of all sums due and releases of mechanic's and materialmen's liens, satisfactory to Lender, from any party having lien rights, which acknowledgments of payment and releases of liens shall cover all work, labor, equipment, materials done, supplied, performed, or furnished prior to such application for an Advance.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.

**Application for Advances.** Borrower shall apply for Advances from the Loan Fund according to the following disbursement schedule: **Twice monthly through Lender's internal fund control.**

Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement. Under no circumstances shall Lender be required to make any Loan Advance in an amount less than **1,000.00.**

**Loan to Value.** Unless waived by Lender in writing, the ratio of the amount of the Loan to the Value of the Property as completed shall not exceed 71.000%.

**Payments.** At the sole option of Lender, Advances may be paid in the joint names of Borrower and the General Contractor, subcontractor(s), or supplier(s) in payment of sums due under the Construction Contract. At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract. Borrower appoints Lender as its attorney-in-fact to make such payments. This power shall be deemed coupled with an interest, shall be irrevocable, and shall survive an Event of Default under this Agreement.

**Projected Cost Overruns.** If Lender at any time determines in its sole discretion that the amount in the Loan Fund is insufficient, or will be insufficient, to complete fully and to pay for the Project, then within ten (10) days after receipt of a written request from Lender, Borrower shall deposit in the Loan Fund an amount equal to the deficiency as determined by Lender. The judgment and determination of Lender under this section shall be final and conclusive. Any such amounts deposited by Borrower shall be disbursed prior to any Loan proceeds.

**Final Payment to General Contractor.** Upon completion of the Project and fulfillment of the Construction Contract to the satisfaction of Lender and provided sufficient Loan Funds are available, Lender shall make an Advance to cover the final payment due to the General Contractor upon delivery to Lender of endorsements to the ALTA title insurance policy following the posting of the completion notice, as provided under applicable law. Construction shall not be deemed complete for purposes of final disbursement unless and until Lender shall have received all of the following:

(1) Evidence satisfactory to Lender that all work under the Construction Contract requiring inspection by any governmental authority with jurisdiction has been duly inspected and approved by such authority, that a certificate of occupancy has been issued, and that all parties performing work have been paid, or will be paid, for such work;

(2) A certification by an engineer, architect, or other qualified inspector acceptable to Lender that the Improvements have been completed substantially in accordance with the Plans and Specifications and the Construction Contract, that direct connection has been made to all utilities set forth in the Plans and Specifications, and that the Project is ready for occupancy; and

(3) Acceptance of the completed Improvements by Lender and Borrower.

**Construction Default.** If Borrower fails in any respect to comply with the provisions of this Agreement or if construction ceases before completion regardless of the reason, Lender, at its option, may refuse to make further Advances, may accelerate the indebtedness under the terms of the Note, and without thereby impairing any of its rights, powers, or privileges, may enter into possession of the construction site and perform or cause to be performed any and all work and labor necessary to complete the improvements, substantially in accordance with the Plans and Specifications.

**Damage or Destruction.** If any of the Collateral or Improvements is damaged or destroyed by casualty of any nature, within sixty (60) days thereafter Borrower shall restore the Collateral and Improvements to the condition in which they were before such damage or destruction with funds other than those in the Loan Fund. Lender shall not be obligated to make disbursements under this Agreement until such restoration has been accomplished.

**Adequate Security.** When any event occurs that Lender determines may endanger completion of the Project or the fulfillment of any condition or covenant in this Agreement, Lender may require Borrower to furnish, within ten (10) days after delivery of a written request, adequate security to eliminate, reduce, or indemnify Lender against, such danger. In addition, upon such occurrence, Lender in its sole discretion may advance funds or agree to undertake to advance funds to any party to eliminate, reduce, or indemnify Lender against, such danger or to complete the Project. All sums paid by Lender pursuant to such agreements or undertakings shall be for Borrower's account and shall be without prejudice to Borrower's rights, if any, to receive such funds from the party to whom paid. All sums expended by Lender in the exercise of its option to complete the Project or protect Lender's interests shall be payable to Lender on demand together with interest from the date of the Advance at the rate applicable to the Loan. In addition, any Advance of funds under this Agreement, including without limitation direct disbursements to the General Contractor or other parties in payment of sums due under the Construction Contract,

**EXHIBIT "2"**

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

shall be deemed to have been expended by or on behalf of Borrower and to have been secured by Lender's Deed of Trust, if any, on the Collateral.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**LIMITATION OF RESPONSIBILITY.** The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of any contract. Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party. Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have any right to rely, upon Lender's determination of the appropriateness of any Advance. No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of any contract.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with all financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information.** Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Insurance.** Maintain fire and other risk insurance, hail, federal crop insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Donald E. Copeland | Unlimited |
| Charles Copeland | Unlimited |
| Janet Ihde | Unlimited |
| David Conston | Unlimited |

**Loan Fees, Charges and Expenses.** Whether or not the Project is completed, Borrower also shall pay upon demand all out-of-pocket expenses incurred by Lender in connection with the preparation of loan documents and the making of the Loan, including, without limitation, all closing costs, fees, and disbursements, all expenses of Lender's legal counsel, and all title examination fees, title insurance premiums, appraisal fees, survey costs, required fees, and filing and recording fees.

**Loan Proceeds.** Use the Loan Funds solely for payment of bills and expenses directly related to the Project.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party,

**CONSTRUCTION LOAN AGREEMENT**

**(Continued)**

Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Construction of the Project.** Commence construction of the Project no later than July 7, 2006, and cause the Improvements to be constructed and equipped in a diligent and orderly manner and in strict accordance with the Plans and Specifications approved by Lender, the Construction Contract, and all applicable laws, ordinances, codes, regulations, and rights of adjoining or concurrent property owners. Borrower agrees to complete the Project for purposes of final payment to the General Contractor on or before December 29, 2007, regardless of the reason for any delay.

**Defects.** Upon demand of Lender, promptly correct any defect in the Improvements or any departure from the Plans and Specifications not approved by Lender in writing before further work shall be done upon the portion of the Improvements affected.

**Project Claims and Litigation.** Promptly inform Lender of (1) all material adverse changes in the financial condition of the General Contractor; (2) any litigation and claims, actual or threatened, affecting the Project or the General Contractor, which could materially affect the successful completion of the Project or the ability of the General Contractor to complete the Project as agreed; and (3) any condition or event which constitutes a breach or default under any of the Related Documents or any contract related to the Project.

**Payment of Claims and Removal of Liens.** (1) Cause all claims for labor done and materials and services furnished in connection with the Improvements to be fully paid and discharged in a timely manner, (2) diligently file or procure the filing of a valid notice of completion of the Improvements, or such comparable document as may be permitted under applicable lien laws, (3) diligently file or procure the filing of a notice of cessation, or such comparable document as may be permitted under applicable lien laws, upon the happening of cessation of labor on the Improvements for a continuous period of thirty (30) days or more, and (4) take all reasonable steps necessary to remove all claims of liens against the Collateral, the Improvements or any part of the Collateral or Improvements, or any rights or interests appurtenant to the Collateral or Improvements. Upon Lender's request, Borrower shall make such demands or claims upon or against laborers, materialmen, subcontractors, or other persons who have furnished or claim to have furnished labor, services, or materials in connection with the Improvements, which demands or claims shall under the laws of the State of California require diligent assertions of lien claims upon penalty of loss or waiver thereof. Borrower shall, within ten (10) days after the filing of any claim of lien that is disputed or contested by Borrower, record or cause the General Contractor for the construction of the Improvements to record in the appropriate governmental office, a surety bond pursuant to California law sufficient to release the claim of lien and, within five (5) days of Lender's demand, make suitable provision by deposit of funds with Lender in an amount satisfactory to Lender or by bond satisfactory to Lender for the possibility that the contest will be unsuccessful. If Borrower fails to remove any lien on the Collateral or Improvements or provide a bond or deposit pursuant to this provision, Lender may pay such lien, or may contest the validity of the lien, and Borrower shall pay all costs and expenses of such contest, including Lender's reasonable attorneys' fees.

**Taxes and Claims.** Pay and discharge when due all of Borrower's indebtedness, obligations, and claims that, if unpaid, might become a lien or charge upon the Collateral or Improvements; provided, however, that Borrower shall not be required to pay and discharge any such indebtedness, obligation, or claim so long as (1) its legality shall be contested in good faith by appropriate proceedings, (2) the indebtedness, obligation, or claim does not become a lien or charge upon the Collateral or Improvements, and (3) Borrower shall have established on its books adequate reserves with respect to the amount contested in accordance with GAAP. If the indebtedness, obligation, or claim does become a lien or charge upon the Collateral or Improvements, Borrower shall remove the lien or charge as provided in the preceding paragraph.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests in the Collateral and Improvements.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation or guideline, or the interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of

**EXHIBIT "2"**

**CONSTRUCTION LOAN AGREEMENT**

capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2) purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Modification of Contract.** Make or permit to be made any modification of the Construction Contract.

**Liens.** Create or allow to be created any lien or charge upon the Collateral or the Improvements.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**GENERAL PROJECT PROVISIONS.** The following provisions relate to the construction and completion of the Project:

**Change Orders.** All requests for changes in the Plans and Specifications, other than minor changes involving no extra cost, must be in writing, signed by Borrower and the architect, and delivered to Lender for its approval. Borrower will not permit the performance of any work pursuant to any change order or modification of the Construction Contract or any subcontract without the written approval of Lender. Borrower will obtain any required permits or authorizations from governmental authorities having jurisdiction before approving or requesting a new change order.

**Purchase of Materials; Conditional Sales Contracts.** No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Project shall be purchased or installed under any Security Agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider such items as personal property after their incorporation into the Project, unless otherwise authorized by Lender in writing.

**Lender's Right of Entry and Inspection.** Lender and its agents shall have at all times the right of entry and free access to the Property and the right to inspect all work done, labor performed, and materials furnished with respect to the Project. Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Project.

**Lender's Right to Stop Work.** If Lender in good faith determines that any work or materials do not conform to the approved Plans and Specifications or sound building practices, or otherwise depart from any of the requirements of this Agreement, Lender may require the work to be stopped and withhold disbursements until the matter is corrected. In such event, Borrower will promptly correct the work to Lender's satisfaction. No such action by Lender will affect Borrower's obligation to complete the Improvements on or before the Completion Date. Lender is under no duty to supervise or inspect the construction or examine any books and records. Any inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement. No default of Borrower will be waived by any inspection by Lender. In no event will any inspection by Lender be a representation that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

**Indemnity.** Borrower shall indemnify and hold Lender harmless from any and all claims asserted against Lender or the Property by any person, entity, or governmental body, or arising out of or in connection with the Property, Improvements, or Project. Lender shall be entitled to appear in any proceedings to defend itself against such claims, and all costs and expenses attorneys' fees incurred by Lender in connection with such defense shall be paid by Borrower to Lender. Lender shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by Lender under this paragraph shall be secured by Lender's security agreement or Deed of Trust, if any, on the Property, shall be deemed an additional principal Advance under the Loan, payable upon demand, and shall bear interest at the rate applicable to the Loan.

**Publicity.** Lender may display a sign at the construction site informing the public that Lender is the construction lender for the Project. Lender may obtain other publicity in connection with the Project through press releases and participation in ground-breaking and opening ceremonies and similar events.

**Actions.** Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the disbursement of funds from the Loan Fund. In connection with this right, Lender may incur and pay reasonable costs, expenses and attorneys' fees. Borrower covenants to pay to Lender on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note, and Lender is authorized to disburse funds from the Loan Fund for such purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any

**CONSTRUCTION LOAN AGREEMENT**

| Loan No: 16041021 | (Continued) | Page 8 |

collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Construction Contract.** The Improvements are not constructed in accordance with the Plans and Specifications or in accordance with the terms of the Construction Contract.

**Cessation of Construction.** Prior to the completion of construction of the Improvements and equipping of the Project, the construction of the Improvements or the equipping of the Project is abandoned or work thereon ceases for a period of more than ten (10) days for any reason, or the Improvements are not completed for purposes of final payment to the General Contractor prior to December 29, 2007, regardless of the reason for the delay.

**Transfer of Property.** Sale, transfer, hypothecation, assignment, or conveyance of the Property or the Improvements or any portion thereof or interest therein by Borrower or any Borrower without Lender's prior written consent.

**Condemnation.** All or any material portion of the Collateral is condemned, seized, or appropriated without compensation, and Borrower does not within thirty (30) days after such condemnation, seizure, or appropriation, initiate and diligently prosecute appropriate action to contest in good faith the validity of such condemnation, seizure, or appropriation.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT; REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may, at its option, but without any obligation to do so, and in addition to any other right Lender without notice to Borrower may have, do any one or more of the following without notice to Borrower: (a) Cancel this Agreement; (b) Institute appropriate proceedings to enforce the performance of this Agreement; (c) Withhold further disbursement of Loan Funds; (d) Expend funds necessary to remedy the default; (e) Take possession of the Property and continue construction of the Project; (f) Accelerate maturity of the Note and/or Indebtedness and demand payment of all sums due under the Note and/or Indebtedness; (g) Bring an action on the Note and/or Indebtedness; (h) Foreclose Lender's security agreement or Deed of Trust, if any, on the Property in any manner available under law; and (i) Exercise any other right or remedy which it has under the Note or Related Documents, or which is otherwise available at law or in equity or by statute.

**COMPLETION OF IMPROVEMENTS BY LENDER.** If Lender takes possession of the Collateral, it may take any and all actions necessary in its judgment to complete construction of the Improvements, including but not limited to making changes in the Plans and Specifications, work, or materials and entering into, modifying or terminating any contractual arrangements, subject to Lender's right at any time to discontinue any work without liability. If Lender elects to complete the Improvements, it will not assume any liability to Borrower or to any other person for completing the Improvements or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability. Borrower irrevocably appoints Lender as its attorney-in-fact, with full power of substitution, to complete the Improvements, at Lender's option, either in Borrower's name or in its own name. In any event, all sums expended by Lender in completing the construction of the Improvements will be considered to have been disbursed to Borrower and will be secured by the Collateral for the Loan. Any such sums that cause the principal amount of the Loan to exceed the face amount of the Note will be considered to be an additional Loan to Borrower, bearing interest at the Note rate and being secured by the Collateral. For these purposes, Borrower assigns to Lender all of its right, title and interest in and to the Project Documents; however Lender will not have any obligation under the Project Documents unless Lender expressly hereafter agrees to assume such obligations in writing. Lender will have the right to exercise any rights of Borrower under the Project Documents upon the occurrence of an Event of Default. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently.

**ADDITIONAL DOCUMENTS.** Borrower shall provide Lender with the following additional documents:

**Articles or Agreement of Partnership.** Borrower has provided or will provide Lender with a certified copy of Borrower's Articles or Agreement of Partnership, together with an appropriate partnership consent or agreement authorizing and designating one or more of the partners to execute this Agreement, the Note and any and all Security Agreements directly or indirectly securing repayment of the same, and to consummate the borrowings and other transactions as contemplated under this Agreement, and to consent to the remedies following any default by Borrower as provided in this Agreement and in any Security Agreements.

**Opinion of Counsel.** When required by Lender, Borrower has provided or will provide Lender with an opinion of Borrower's counsel certifying to and that: (1) Borrower's Note, any Security Agreements and this Agreement constitute valid and binding obligations on Borrower's part that are enforceable in accordance with their respective terms; (2) Borrower is validly existing and in good standing; (3) Borrower has authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement; and (4) such other matters as may have been requested by Lender or by Lender's counsel.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**EXHIBIT "2"**

## CONSTRUCTION LOAN AGREEMENT
### (Continued)

Loan No: 16041021                                                                      Page 9

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Authority to File Notices.** Borrower appoints and designates Lender as its attorney-in-fact to file for the record any notice that Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Related Documents.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** *This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.*

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Riverside County, State of California.

**Indemnification of Lender.** *Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's attorneys' fees, as well as Lender's architect's and engineering fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and remedies granted Lender under this. The foregoing indemnity provisions shall survive the cancellation of this Agreement as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Lender elects to exercise any of the remedies as provided under this Agreement following default hereunder.*

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**EXHIBIT "2"**

**CONSTRUCTION LOAN AGREEMENT**

Loan No: 16041021    **(Continued)**    Page 10

---

**Agreement.** The word "Agreement" means this Construction Loan Agreement, as this Construction Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Construction Loan Agreement from time to time.

**Architect's Contract.** The words "Architect's Contract" mean the architect's contract dated September 10, 2004 between Borrower and Boka Powell, the architect for the Project.

**Borrower.** The word "Borrower" means Copeland Properties Twelve, LP, a California limited partnership and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Completion Date.** The words "Completion Date" mean December 29, 2007.

**Construction Contract.** The words "Construction Contract" mean the contract dated May 1, 2006 between Borrower and Nordby Construction, the general contractor for the Project, and any subcontracts with subcontractors, materialmen, laborers, or any other person or entity for performance of work on the Project or the delivery of materials to the Project.

**Contractor.** The word "Contractor" means Nordby Construction, the general contractor for the Project.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan and any guarantor under a completion guaranty agreement.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Collateral.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Pacific Western National Bank, its successors and assigns.

**Loan.** The word "Loan" means the loan or loans made to Borrower under this Agreement and the Related Documents as described .

**Loan Fund.** The words "Loan Fund" mean the undisbursed proceeds of the Loan under this Agreement together with any equity funds or other deposits required from Borrower under this Agreement.

**Note.** The word "Note" means the promissory note dated July 12, 2006, in the original principal amount of **$13,265,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure Indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Plans and Specifications.** The words "Plans and Specifications" mean the plans and specifications for the Project which have been submitted to and initialed by Lender, together with such changes and additions as may be approved by Lender in writing.

**Project.** The word "Project" means the construction project as described in the "Project Description" section of this Agreement.

**Project Documents.** The words "Project Documents" mean the Plans and Specifications, all studies, data and drawings relating to the Project, whether prepared by or for Borrower, the Construction Contract, the Architect's Contract, and all other contracts and agreements relating to the Project or the construction of the Improvements.

**Property.** The word "Property" means the property as described in the "Project Description" section of this Agreement.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in the "Project Description" section of this Agreement.

**EXHIBIT "2"**

**CONSTRUCTION LOAN AGREEMENT**
**(Continued)**

Loan No: 16041021                                                    Page 11

---

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Value.** The word "Value" means such amount or worth as defined and determined by Lender in its sole discretion unless agreed to the contrary by Lender in writing.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS CONSTRUCTION LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS CONSTRUCTION LOAN AGREEMENT IS DATED JULY 12, 2006.

BORROWER:

COPELAND PROPERTIES TWELVE, LP, A CALIFORNIA LIMITED PARTNERSHIP

COPELAND REALTY, INC., A CALIFORNIA CORPORATION, Managing General Partner of Copeland Properties Twelve, LP, a California limited partnership

By: _____
    Donald  E.  Copeland,  President/Secretary  of
    Copeland Realty, Inc., a California corporation

LENDER:

PACIFIC WESTERN NATIONAL BANK

By: _____
    Authorized Signer

---

LASER PRO Lending, Ver. 5.39.00.002 Copr. Harland Financial Solutions, Inc. 1987, 2006.  All Rights Reserved.  - CA  I:\HARPWNB\CFIWIN\CFILPL\C41.FC  TR-8310  PR-12

EXHIBIT "2"

EXHIBIT "A"

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California,
County of Riverside, City of, described as follows:

PARCEL 2 AND LETTERED LOT C OF PARCEL MAP 30677, AS SHOWN BY
MAP ON FILE IN BOOK 208 PAGE(S) 82 AND 83, OF PARCEL MAPS,
RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

EXCEPT ALL COAL, OIL, GAS AND OTHER MINERAL DEPOSITS IN THE
LAND SO PATENTED, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE
AND REMOVE THE SAME ACCORDING TO THE PROVISIONS OF SAID ACT OF
JUNE 1, 1938, AS RESERVED BY THE UNITED STATES OF AMERICA IN A
PATENT RECORDED JANUARY 31, 1958 IN BOOK 2215 PAGE 565 OF
OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

ALSO EXCEPTING THEREFROM ALL URANIUM, THORIUM AND ANY OTHER
MATERIAL WHICH IS OR MAY BE DETERMINED TO BE PECULIARLY
ESSENTIAL TO THE PRODUCTION OF FISSIONABLE MATERIALS, WHETHER
OR NOT OF COMMERCIAL VALUE, TOGETHER WITH THE RIGHT OF THE
UNITED STATES OF AMERICA THROUGH ITS AUTHORIZED AGENTS OR
REPRESENTATIVES AT ANY TIME TO ENTER UPON THE LAND AND PROSPECT
FOR, MINE AND REMOVE SAME, AS RESERVED IN PATENT FROM THE
UNITED STATES OF AMERICA RECORDED OCTOBER 14, 1953 IN BOOK 1516
PAGE 194 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

NOTE: A CONDOMINIUM PLAN AFFECTING SAID PROPERTY WAS RECORDED
JULY 15, 2004 AS INSTRUMENT NO. 04-550900 OF OFFICIAL RECORDS,
AS AMENDED BY AMENDMENT TO CONDOMINIUM PLANS RECORDED JANUARY
21, 2005 AS INSTRUMENT NO. 05-059343 AND AS AMENDED BY SECOND
AMENDMENT TO CONDOMINIUM PLANS RECORDED APRIL 13, 2005 AS
INSTRUMENT NO. 05-290327 OF OFFICIAL RECORDS, AND AS AMENDED BY
THIRD AMENDMENT TO CONDOMINIUM PLANS RECORDED OCTOBER 3, 2005
AS INSTRUMENT NO. 05-819502 OF OFFICIAL RECORDS.

End of Legal Description

EXHIBIT "2"



PACIFIC WESTERN BANK

EXTENSION AND AMENDMENT
TO PROMISSORY NOTE

LENDER:      Pacific Western Bank
             78-080 Calle Estado, Suite 201
             La Quinta, CA 92253
             (760) 777-6451


BORROWER:    Copeland Properties Twelve, LP
             25809 Business Center Drive, Suite F
             Redlands, CA 92374
             (909) 799-8580


PROMISSORY NOTE      (1)    Loan No.: 16041021
INFORMATION:         (2)    Original Note Date: July 12, 2006
                     (3)    Original Principal Amount: $13,265,000
                     (4)    Original Maturity Date: January 12, 2008
                     (5)    Interest Rate: Pacific Western Bank Reference Rate: B+.5%
                     (6)    Current Principal Balance: $11,118,612.24

Subject to satisfaction of the condition(s) stated below, Effective as of January 15, 2008,

Borrower and Lender agree that the Promissory Note identified above, as may have been modified

from time to time ("Note"), may be amended by extending the maturity date to April 12, 2008

("Extended Maturity Date"). Monthly payments will continue during the extended period provided

for in this Amendment in the same amount and at the same time of the month as provided in the

Payment section of the Note. The final payment is due on the Extended Maturity Date.


EXTENSION AND AMENDMENT TO PROMISSORY NOTE                    1
Rev. 5/2007


**EXHIBIT "2"**

All of the terms and conditions of the Note are fully ratified and incorporated into this Amendment by this reference, and Borrower agrees that all terms and conditions of the Note, except as modified herein, shall remain in full force and effect and shall be enforceable in accordance with their terms. Borrower further agrees that nothing contained in this Amendment constitutes a waiver or release of any collateral pledged by any person in connection with the making of the Note. If a Borrower under the Note does not sign this Amendment, such Borrower will remain liable under the terms and conditions of the Note, unless specifically released in writing signed by Lender. Borrower agrees to execute any additional documents that Lender may request in connection with this Amendment of the Note.

**Condition(s) to Effectiveness.** Borrower acknowledges that this Amendment will not become effective to modify the Note, even if executed by the Borrower and the Bank, until such time as:

(1) this Amendment has been approved by the Bank's Note Department. Bank will advise Borrower when and if such approval has been obtained, and

(2) N/A

ALL TERMS OF THIS AMENDMENT ARE AGREED TO BY BORROWER, AND BORROWER ACKNOWLEDGES RECEIPT OF A COPY OF THIS AMENDMENT.

BY SIGNING THIS AMENDMENT, EACH PARTY AGREES THAT (1) THIS AMENDMENT REPRESENTS THE FINAL EXPRESS OF THE AGREEMENTS BETWEEN THE PARTIES, (2) THERE ARE NO UNWRITTEN OR ORAL AGREEMENTS BETWEEN THE PARTIES, AND (3) THIS AMENDMENT AND ANY OTHER WRITTEN AGREEMENTS BETWEEN THE PARTIES MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR,

**EXHIBIT "2"**

CONTEMPORANEUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF

THE PARTIES.

DATED: January 15, 2008

BORROWER:

Copeland Properties Twelve, LP, a CALIFORNIA Limited Partnership
By: Copeland Wealth Management, a Real Estate Corporation, Managing General Partner

By: _____
Name:   Donald E. Copeland
Title:   President / Secretary


LENDER:

By: _____
Name:   Tracy Stockman
Title:   Vice President


## ACKNOWLEDGMENT OF GUARANTOR

The undersigned, Guarantor(s) of the Note, agree and consent to the modification of the Note
as provided in this Amendment.

DATED: 2/8 , 2008
_____
Guarantor, Copeland Wealth Management, A Real
Estate Corporation
By: Donald E. Copeland- President/Secretary

DATED: 2/8 , 2008
_____
Guarantor, Donald E. Copeland- Individually

DATED: 2/8 , 2008
_____
Guarantor, Charles Copeland- Individually

DATED: 2/8 , 2008
_____
Guarantor, Janet Ihde- Individually

EXTENSION AND AMENDMENT TO PROMISSORY NOTE
Rev. 5/2007

3

**EXHIBIT "2"**

DATED: 2/8 , 20 08

_____
Guarantor, David Conston- Individually

DATED: 2/8 , 2008

_____
Guarantor, Ihde Conston, Inc.
By Janet Ihde- President/Secretary

EXTENSION AND AMENDMENT TO PROMISSORY NOTE
Rev. 5/2007

4

**EXHIBIT "2"**

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $16,070,000.00 | 07-12-2006 | 10-12-2008 | 16041021 | | Port #574474 | 206 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Copeland Properties Twelve, LP, a California limited
partnership
25809 Business Center Drive, Suite F
Redlands, CA 92374

**Lender:** Pacific Western Bank
Desert Region Real Estate
78080 Calle Estado
Suite 201
La Quinta, CA 92253

---

**Principal Amount:** $16,070,000.00    **Initial Rate:** 5.500%    **Date of Agreement:** May 1, 2008

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

Promissory Note originally made to Pacific Western National Bank, now known as Pacific Western Bank, a California state-chartered bank, dated July 12, 2006, in the original Principal Amount of $13,265,000.00 as modified by an Extension and Amendment to Promissory Note dated January 15, 2008 together with all renewals, extensions and modifications related thereto (the "Note").

**DESCRIPTION OF COLLATERAL.**

Commercial Security Agreement and Deed of Trust dated July 12, 2006 granting Lender a security interest in that certain real and personal property located at 35-800 Bob Hope Drive, Rancho Mirage, CA 92270.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The Note is hereby modified as follows:

(a) The date on which all outstanding principal is due and payable (together with any accrued but unpaid interest thereon) (the "Maturity Date") is hereby extended from April 12, 2008 to October 12, 2008. Notwithstanding the Maturity Date, Borrower shall make regular payments as further outlined in this Agreement.

(b) The Principal Amount of the Note is hereby increased from $13,265,000.00 to $16,070,000.00. Borrower promises to pay to Lender, the principal amount of $16,070,000.00, or so much as may be outstanding, together with any accrued but unpaid interest due on the unpaid outstanding principal balance of each advance made under the Note.

2. A Modification of Deed of Trust of even date is hereby executed concurrently with this Agreement.

3. Borrower shall cause Donald E. Copeland, Janet Ihde, Charles Copeland, David Conston and Rancho Mirage Surgery Center, L.L.C., a California limited liability company to execute Commercial Guaranties of the loans in favor of Lender, on Lender's forms and in the amounts and under the conditions set forth in such guaranties.

4. Lender is hereby changed from Pacific Western National Bank to Pacific Western Bank, a California state-chartered bank.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 12, 2008. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 12, 2008, with all subsequent interest payments to be due on the same day of each month after that.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an index which is the Lender's Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 5.000% per annum. The interest rate to be applied to the unpaid principal balance during this loan will be at a rate of 0.500 percentage points over the Index, resulting in an initial rate of 5.500% per annum. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**INTEGRATION.** The parties agree that (a) this Agreement, the Construction Loan Agreement or Business Loan Agreement, as applicable, which governs the Note, together with all of the Related Documents, represents the final agreement between the parties, and therefore incorporates all negotiations of the parties hereto (b) there are no unwritten oral agreements between the parties, and (c) this Agreement may not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreements or understandings of the parties.

**EXHIBIT "2"**

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

COPELAND PROPERTIES TWELVE, LP, A CALIFORNIA LIMITED PARTNERSHIP

COPELAND WEALTH MANAGEMENT, A REAL ESTATE CORPORATION, A CALIFORNIA CORPORATION, General Partner of Copeland Properties Twelve, LP, a California limited partnership

By: _____
    Donald  E.  Copeland,  President/Secretary  of
    Copeland  Wealth  Management,  A  Real  Estate
    Corporation, a California corporation

LASER PRO Lending, Ver. 5.39.00.006  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  I:\HARPWIN\CFI\WIN\CFI\LPL\D20C.FC  TR-4310  PR-13

**CHANGE IN TERMS AGREEMENT**

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $16,070,000.00 | 07-12-2006 | 01-12-2009 | 1604102 | | Port #574474 | 206 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Copeland Properties Twelve, LP, a California limited
partnership
25809 Business Center Drive, Suite B
Redlands, CA 92374

**Lender:** Pacific Western Bank
Desert Region Real Estate
78080 Calle Estado
Suite 201
La Quinta, CA 92253

---

**Principal Amount: $16,070,000.00**                    **Date of Agreement: November 4, 2008**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**

Promissory Note originally made to Pacific Western National Bank, now known as Pacific Western Bank, a California state-chartered bank, dated July 12, 2006, in the original Principal Amount of $13,265,000.00 as modified by an Extension and Amendment to Promissory Note dated January 15, 2008 and a Change in Terms Agreement dated May 1, 2008 together with all renewals, extensions and modifications related thereto (the "Note").

**DESCRIPTION OF COLLATERAL.**

Commercial Security Agreement and Deed of Trust dated July 12, 2006 granting Lender a security interest in that certain real and personal property located at 35-800 Bob Hope Drive, Rancho Mirage, CA 92270.

**DESCRIPTION OF CHANGE IN TERMS.**

1. The Note is hereby modified as follows:

The Maturity Date is hereby extended from October 12, 2008 to January 12, 2009. Notwithstanding the Maturity Date, Borrower shall make regular payments as further outlined in this Agreement.

2. Borrower shall cause Donald E. Copeland, Janet Ihde, Charles Copeland, David Conston, and Rancho Mirage Surgery Center, L.L.C., a California limited liability company to execute Commercial Guaranties of the loans in favor of Lender, on Lender's forms and in the amounts and under the conditions set forth in such guaranties.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 12, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 12, 2008, with all subsequent interest payments to be due on the same day of each month after that.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an index which is the Lender's Base Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans and is set by Lender in its sole discretion. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.000% per annum. The interest rate to be applied to the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points over the Index, resulting in an initial rate of 4.500%. NOTICE: Under no circumstances will the interest rate on this loan be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**INTEGRATION.** The parties agree that (a) this Agreement, the Construction Loan Agreement or Business Loan Agreement, as applicable, which governs the Note, together with all of the Related Documents, represents the final agreement between the parties, and therefore incorporates all negotiations of the parties hereto (b) there are no unwritten oral agreements between the parties, and (c) this Agreement may not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreements or understandings of the parties.